**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellant,**

**v.**

**Dagoberto AGUILAR–RAMOS,**
**Defendant–Appellee.**

**No. 03SA312.**

Supreme Court of Colorado,
En Banc.

March 15, 2004.

A.M. Dominguez, Jr., District Attorney, Rebecca Jane Wilson Brunswig, Chief Deputy District Attorney, Greeley, Colorado, Attorney for Plaintiff–Appellant.

Coleman, Liu, Lyons, & Wheeler, LLP, Dea M. Wheeler, Greeley, Colorado, Attorney for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

The People bring an interlocutory appeal challenging the trial court's order suppressing the statements made to the police by the defendant, Dagoberto Aguilar–Ramos. The trial court ruled that the defendant "did not knowingly and intelligently waive his right to remain silent because he was never so advised," and that the defendant was not sufficiently advised of his right to have an attorney present or of the possibility that his statements could be used against him. As such, the trial court concluded that the defendant did not knowingly and intelligently waive his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We now affirm the trial court's order.

## I. Facts

In the early morning hours of October 12, 2002, three police officers picked up Aguilar–Ramos at his residence in Greeley in connection with a kidnapping and sexual assault incident which had been committed the night before. Aguilar–Ramos was first discovered at the bottom of a flight of stairs at the house, whereupon an officer drew his weapon and urged the defendant, in English, to come out into the open. The officers then relied on the assistance of another resident of the house in order to inform Aguilar–Ramos, in Spanish, that they wished to question him at the police station. The defendant cooperated, and was taken to the Greeley police station where he was left in an interview room awaiting questioning.

A short while later, Detective Lobato entered the room and began interviewing Aguilar–Ramos in Spanish. At the outset of the videotaped interview, which was conducted entirely in Spanish,[1] Detective Lobato spent several minutes attempting to get personal information from the defendant, including his name, where he was from, and how long he had been present in the country. The detective then presented Aguilar–Ramos with a printed *Miranda* rights form in Spanish and proceeded to read the defendant his rights in Spanish. After Detective Lobato had finished reading the form, he asked Aguilar–Ramos if he understood the rights explained. Aguilar–Ramos asked, "What does it mean yes. If I want my attorney.... How ...

---

1. Throughout this opinion, we will be using the English language translation of the interview transcript upon which the trial court relied.

how ... can I put down here?" The detective responded, "O.K. The ... question is, do you understand these rights that I have explained. Answer yes or no." Detective Lobato then explained to Aguilar–Ramos that he needed to sign the form so that he could talk to the detective, and further told him that "when you talk to me if you don't want to talk to me no more, say to me, I don't want to talk to you." Aguilar–Ramos laughed in response to that advisement, and proceeded to sign the form as directed.

Detective Lobato allowed the defendant to read the form twice more, whenever questioning resumed. Each time, the detective asked Aguilar–Ramos if he understood his rights, and the defendant indicated that he did. On a couple of occasions, other officers, none of whom spoke Spanish, entered the interview room in order to convey information to Detective Lobato or to direct the detective to ask specific questions of the defendant. Over the course of several hours of questioning, Aguilar–Ramos made incriminating statements regarding his role in the kidnapping and sexual assault, leading to the criminal charges against him.

Prior to trial, Aguilar–Ramos filed a motion to suppress his statements as being obtained in violation of his rights under *Miranda*. A hearing was held in order to determine whether the defendant knowingly and intelligently waived his rights prior to the interrogation. Testimony was taken from Detective Lobato and Aguilar–Ramos, as well as from other officers involved in the night's events and two defense experts.

Detective Lobato testified that he had only received one or two years of Spanish language instruction during high school, although he had been using the language periodically throughout his professional career. The detective conceded that during the interrogation he had struggled with several words, that he used English words rather than Spanish when necessary, that he "didn't catch" the defendant's request for information about how to obtain an attorney, and that although there were times throughout the interview when he did not understand what Aguilar–Ramos was saying to him, he did not always ask the defendant to repeat his answer. Additionally, Detective Lobato testified that interpretive help was sought from three Spanish-speaking officers, none of whom was available to assist the detective in his interrogation that night.

According to the primary defense expert witness, a certified court interpreter who had spent fifty hours reviewing the transcript and the videotaped interview, Detective Lobato's lack of proficiency in Spanish rendered him unable to effectively communicate with Aguilar–Ramos. The expert noted three specific problems with Detective Lobato's *Miranda* warnings. First, the detective told Aguilar–Ramos that he had the right to "carry" silent, rather than to remain silent. Second, the detective used the word "designar" in describing the right to counsel, which has two meanings in Spanish—to appoint or to design. According to the expert, that warning in no way adequately informed the defendant that he had the right to have counsel present at the interview and appointed to him free of charge. Finally, the expert noted Detective Lobato's failure to respond to the defendant's question regarding the right to have counsel present.

In addition to these difficulties with the warnings, the defense expert observed several other indicators of miscommunication including the fact that it took Detective Lobato eight efforts to obtain the defendant's name prior to the interrogation, that Aguilar–Ramos would frequently provide answers that had nothing to do with the actual questions asked, and that the detective did not know several words in Spanish crucial to the interrogation and the resulting sexual assault charge; specifically, Detective Lobato did not know the Spanish words for vagina, penis, condom, ejaculate, semen, or underwear.

Aguilar–Ramos also testified at the hearing regarding his inability to understand the warnings communicated to him by Detective Lobato. In particular, the defendant testified that he had only three years of schooling in Mexico, that he had been in the country illegally for only fifteen days when he was picked up, and that he was scared when he was picked up because he "didn't know what was going on" and he was afraid "maybe [the officers] were going to beat [him] up." Fi-

nally, Aguilar–Ramos stated that he did not understand what was being told to him when the warnings were being read, and although he tried to learn how to obtain an attorney, the detective would not tell him anything.

Based on the above testimony, the trial court concluded that the prosecution had failed to prove by a preponderance of the evidence that Aguilar–Ramos had waived his *Miranda* rights knowingly and intelligently. Applying the "totality of the circumstances" test, *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), *People v. Platt,* 81 P.3d 1060, 1065 (Colo.2004), the trial court found that the defendant had not been sufficiently advised of his rights. The trial court relied in particular on Detective Lobato's use of the Spanish word for "carry" rather than "remain" as to the right to remain silent, the detective's failure to answer the defendant's question regarding his right to an attorney, and the detective's inability to accurately convey to the defendant the possibility that any incriminating information which Aguilar–Ramos provided could be used against him. Because the defendant had not knowingly and intelligently waived his rights prior to the interrogation, the trial court ruled that his incriminating statements made to Detective Lobato must therefore be suppressed. The People brought this interlocutory appeal challenging that ruling.

The People argue that Aguilar–Ramos at least "minimally understood" his *Miranda* advisement sufficiently so that, under the totality of the circumstances, he had knowingly and intelligently waived his rights. *People v. Al–Yousif,* 49 P.3d 1165, 1172 (Colo. 2002). To support their argument, the People note that the defendant several times indicated his understanding by answering "yes" when asked if he understood the rights as explained and by signing the Spanish *Miranda* waiver. Thus, the People conclude that the preponderance of the evidence suggests that Aguilar–Ramos did in fact knowingly and intelligently waive his rights. We disagree with the People's argument and therefore affirm the trial court's order suppressing the defendant's statements.

## II. CONSTITUTIONAL FRAMEWORK & STANDARD OF REVIEW

It is well-established that an accused must be advised of his rights under the Fifth and Fourteenth Amendments prior to undergoing custodial interrogation. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. In particular, officers must inform a suspect that he has the right to remain silent, that if he waives his right to that silence anything he says may be used against him, that he has the right to have an attorney present, and that an attorney will be appointed free of charge if the suspect cannot afford an attorney. *Id.* A suspect will be deemed to have waived those rights only if the waiver is made voluntarily, knowingly, and intelligently based on the totality of the circumstances surrounding the interrogation. *Moran,* 475 U.S. at 421, 106 S.Ct. 1135; *Platt,* 81 P.3d at 1065. A statement obtained as a result of an invalid waiver may not be used against the defendant in a resulting criminal prosecution, but instead will be suppressed by the trial court. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

Where a defendant challenges the use of his incriminating statements on the grounds that his rights under *Miranda* were violated, the prosecution bears the burden of proving by a preponderance of the evidence that the defendant gave his *Miranda* waiver voluntarily, knowingly, and intelligently. *Platt,* 81 P.3d at 1065. A trial court must examine the "totality of the circumstances" surrounding an interrogation to determine first whether the waiver was a voluntary act and second whether the defendant "possess[ed] an awareness of both the nature of the right and the consequences of the decision to waive it" such that the waiver may be deemed knowing and intelligent. *People v. Mejia–Mendoza,* 965 P.2d 777, 780 (Colo. 1998). In reaching its determination, the trial court must resolve "disputed facts," and a reviewing court will not overturn such findings of historical fact so long as they are supported by competent evidence in the record. *People v. Owens,* 969 P.2d 704, 707 (Colo.1999); *People v. Quezada,* 731 P.2d 730, 732 (Colo.1987). However, the ultimate determination of whether a defendant did in

fact validly waive his *Miranda* rights requires an application of the law to those facts and we review that conclusion of constitutional law de novo. *People v. Al–Yousif,* 49 P.3d 1165, 1169 (Colo.2002) ("[A]ppellate courts have an enhanced role in examining a trial court's application of law to fact, particularly in the arena of constitutional rights."); *People v. Matheny,* 46 P.3d 453, 462 (Colo.2002) (noting that "law application, which involves the application of the controlling legal standard to the facts established by the evidence and found by the trial court is a matter for de novo appellate review ... where constitutional rights are concerned").

We have previously addressed the sufficiency of a waiver in the context of language barriers, and have reached various results depending on the circumstances of each case. *Al–Yousif,* 49 P.3d at 1167 (overturning the suppression of a statement made by a Saudi native who had received *Miranda* warnings in English); *Mejia–Mendoza,* 965 P.2d at 778 (upholding the suppression of a statement made by a Spanish-speaking defendant based on errors in translation). While each result turns on the specific facts of the case, some guiding principles have emerged.

In *Mejia–Mendoza,* we upheld the suppression of a Spanish-speaking defendant's statements where the interpreter mistranslated the *Miranda* advisement and made additional mistranslations between the defendant and the detective. *Mejia–Mendoza,* 965 P.2d at 781. There, while we recognized "that no translation is perfect," we nevertheless required that "a person acting as an interpreter must be sufficiently capable of accurately expressing the substance of the suspect's rights." *Id.* at 781–82. Under the facts of that case, we concluded that the interpreter's linguistic deficiencies contributed to the defendant's inability to adequately understand, and therefore knowingly and intelligently waive, his *Miranda* rights. *Id.* at 782. As such, suppression of his statement was appropriate. *Id.*

In *Al–Yousif,* we expressly distinguished *Mejia–Mendoza* in overturning the suppression of the defendant's statement. *Al–Yousif,* 49 P.3d at 1172 n. 4. The trial court's suppression order had been based on linguistic as well as cultural barriers to the defendant's understanding of American constitutional rights, but we found that the defendant's "rudimentary understanding" of the rights as read to him was sufficient to uphold his waiver. *Id.* at 1172. There, we noted that a "defendant need not understand every consequence of his decision to waive" and that a defendant's cultural background "has limited relevance: it goes only to whether he understood his basic choices—not whether he understood the tactical advantages of each or the constitutional premise upon which they are based." *Id.* at 1169–70. Thus, because the defendant's language abilities allowed him to understand the basic nature of the rights as read to him, suppression of his statement was not warranted. *Id.* at 1172.

■ Viewing these cases together, while we have acknowledged the limited nature of understanding which must be proven to show a knowing and intelligent waiver, we have still required that the prosecution demonstrate that the police accurately communicate and that the defendant understand these "three precepts: (1) he did not have to talk, (2) he could have an attorney present, and (3) if he did talk, his statements could be used against him." *Id.* at 1172; *see also, e.g., People v. Jiminez,* 863 P.2d 981, 984–85 (Colo.1993) (upholding the suppression of the defendant's statement where the defendant suffered from a mental disability such that he functioned at a six-year-old level, had never attended school, and had limited vocabulary both in his native Kickapoo language and in Spanish, the language used for the interrogation). With these principles in mind, we turn to the instant case.

## III. APPLICATION

■ The trial court, after considering the totality of the circumstances surrounding the custodial interrogation and the *Miranda* advisement, ruled that the prosecution had failed to meet its burden of proving, by a preponderance of the evidence, that the waiver was knowing and intelligent.[2] We find

2. The defendant did not argue that he experi-     enced any sort of police intimidation or coercion

ample support in the record for the trial court's finding that the defendant was not adequately advised of and did not understand his *Miranda* rights, and therefore accept that finding for the purposes of our constitutional analysis. *See People v. Owens*, 969 P.2d 704, 707 (Colo.1999) ("The trial court's findings of historical fact are entitled to deference by appellate courts and will only be overturned if they are not supported by competent evidence."). Additionally, reviewing the trial court's ultimate conclusion of law de novo, we agree that Aguilar–Ramos was not sufficiently advised of his rights under *Miranda* and, consequently, that his waiver could not have been knowing and intelligent.

Detective Lobato's difficulties in communicating with Aguilar–Ramos were evident from the outset of the interview, when it took the detective eight attempts to learn his suspect's name. In fact, as he later testified, the detective was aware of the linguistic barrier at the time of the interrogation and even sought assistance from other officers who were apparently unavailable at that time. Moreover, although the defendant frequently responded "yes" when asked if he understood his rights, he also interjected "yes" or "yeah" throughout the reading of the *Miranda* form, and at other inappropriate moments, such that his affirmation cannot be taken as a serious indicator of comprehension. When Aguilar–Ramos did attempt to learn more information about his right to an attorney, his question was either ignored or misunderstood altogether, and he was instead directed to indicate that he understood his rights because it was the detective's "job to talk with all the people." Finally, throughout the interrogation, it is evident from the disjointed nature of the questions and answers that each party frequently had no idea what the other was talking about. Thus, looking at the totality of the circumstances surrounding the interrogation, the defendant clearly did not understand his rights sufficiently to waive them, and that inability should have been recognized by Detective Lobato even from the beginning of their contact.

such that his waiver was not a "voluntary act," leaving only the issue of whether the waiver was

In upholding the trial court's suppression order, we do not require that every bilingual effort between an officer and a suspect be perfect in order to withstand scrutiny. Indeed, we require only that a defendant "minimally understand" that he had the right to remain silent and to have counsel present and that anything he said could be used against him. *Al–Yousif*, 49 P.3d at 1172. Moreover, we recognize that the exclusion of statements where "there were no signs indicating any degree of confusion serves no purpose because there is nothing more the police could do, nor is there any objectionable police behavior." *Id.* at 1170 (internal quotations omitted). However, where, as here, the police fail to accurately communicate to the defendant his basic rights under *Miranda*, and the defendant is therefore unable to understand those rights, any resulting waiver must be deemed constitutionally insufficient.

## IV. CONCLUSION

Because the trial court's findings that the defendant did not even minimally understand the rights as read to him are supported by competent evidence in the record, and the trial court applied the appropriate constitutional standard to those findings, we affirm the trial court's suppression order.

knowing and intelligent under *Miranda. See Mejia–Mendoza*, 965 P.2d at 780.